# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### OWENSBORO DIVISION

CIVIL ACTION NO. 4:15-CV-00016-JHM

RICHARD L. STANSBURY and                                    PLAINTIFFS
MARY F. STANSBURY

V.

HOPKINS HARDWOODS, INC.,                                    DEFENDANTS
ROBERT HENRY CHRIST, DONALD
HAYES, and JAMES C. SPEAKS

AND

HOPKINS HARDWOODS, INC.                          COUNTER-CLAIMANT

V.

RICHARD L. STANSBURY and                      COUNTER-DEFENDANTS
MARY F. STANSBURY

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on motions for summary judgment by Defendants
Hopkins Hardwoods, Inc. and Robert Henry Christ (DN 138-1) and Defendants Donald Hayes
and James C. Speaks (DN 132), as well as a motion by Hopkins Hardwoods and Christ to
exclude the expert witness of Plaintiffs Richard L. and Mary F. Stansbury. (DN 135-1.)  Fully
briefed, these matters are ripe for decision.

## I.    BACKGROUND

Richard and Mary Stansbury purchased a 2,551-acre tract of land in Meade County,
Kentucky, known as the "Kimball tract" in December 2008 for $4,156,050.00.  (Dep. Richard
Stansbury [DN 134-1] at 37:12, 41:18; Kimball Deed [DN 134-2] at 2–4.)  Before purchasing the
Kimball tract, Stansbury had a timber cruise performed on the property by Harold Gordon.

(Dep. Richard Stansbury [DN 134-1] at 26:10; Gordon Cruise [DN 134-2] at 16–19.)  This cruise estimated that the Kimball tract contained around 6.5 million board feet of timber, and it valued the timber at over $4.1 million.  (Gordon Cruise [DN 134-2] at 16–19.)  The Stansburys sold a 792-acre portion of the Kimball tract in July 2011 to Yager Family, LLC for around $1.8 million, retaining the timber rights on the "Yager tract" for five years after the date of sale.  (Dep. Richard Stansbury [DN 134-1] at 50:11, 51:6, 57:12, 63:24; Yager Deed [DN 134-2] at 26–35.)

At some point prior to the sale of the Yager tract, it became known in Meade County that the Stansburys were interested in selling the timber rights to both the Kimball tract and the Yager tract.  While the extent to which the Stansburys were marketing the timber rights is unclear, Stansbury stated that he valued the timber rights at $3.5 million.  (Dep. Richard Stansbury [DN 134-1] at 70:21.)  A group of three individuals became interested in acquiring the timber rights: Defendant Donald Hayes, Defendant James C. ("Jimmy") Speaks, and Samuel Dunaway.  (Dep. Donald Hayes [DN 120-1] at 73:6; Dep. James Speaks [DN 121-1] at 71:22.)  At the time, Dunaway was the owner and president of both Dunaway Timber Company and Defendant Hopkins Hardwoods, Inc.  (Dep. Robert Christ [DN 130-1] at 18:6, 20:23.)  Hopkins Hardwoods acquires timber rights and then sells the lumber to Dunaway Timber for use at its mills.  (*Id.*)  The three individuals agreed to hire Rick Sluss to perform his own timber cruise on the property in February 2010.  (Dep. Donald Hayes [DN 120-1] at 73:6; Dep. James Speaks [DN 121-1] at 74:15; Dep. Rick Sluss [DN 127-1] at 16:6.)  Sluss sent the completed cruise to Speaks in March 2010, but instead of estimating a value on the timber, he only provided an estimate of the amount of board feet on the Kimball tract.  (Dep. Rick Sluss [DN 127-1] at 20:19.)  The key document from this timber cruise is entitled "Tract: volume, total by product and species," as it indicates that there are over seven million board feet on the tracts. (Sluss Cruise [DN 134-2] at 37.)

Sam Dunaway transferred his ownership interest in Dunaway Timber and Hopkins Hardwoods to Defendant Robert Christ in December 2010. (Dep. Robert Christ [DN 130-1] at 58:6.) Christ, as president of Hopkins Hardwoods, entered into a contract with the Stansburys in September 2011 for the purchase of the timber rights the Stansburys possessed over the Yager tract and almost all of the Kimball tract, agreeing to pay $2.2 million for the rights. (Dep. Robert Christ [DN 130-1] at 179:18; Timber Rights Contract [DN 134-2] at 44.) Hopkins Hardwoods also paid Speaks $300,000 as a finder's fee that Christ believed was to be split evenly between Speaks and Hayes. (Dep. Robert Christ [DN 130-1] at 182:7.) The timber contract was merged into and superseded by a timber deed, which specified that Hopkins Hardwoods had the right to harvest timber for a period of five years from each tract. (Timber Deed [DN 134-2] at 46–61.) However, Hopkins Hardwoods was not to harvest any trees with a diameter smaller than fourteen inches at a height of twelve inches off the ground on the Yager tract, and it was not to do the same on the Kimball tract to any tree smaller than fourteen inches at stump height. (*Id.* at 46–47.) Further, Hopkins Hardwoods was to keep gates locked at all times and not harvest any cedar trees, among other provisions. (*Id.* at 47–48.) Hopkins Hardwoods began work at the Kimball and Yager tracts shortly thereafter in January 2012. (Dep. Robert Christ [DN 130-1] at 225:1.) Stansbury alleges that all of the above provisions of the timber deed have at some point been violated, as well as alleging that rock from the creek bed on the property was taken without permission. (Compl. [DN 1] ¶¶ 38–45.)

In January 2015, Richard Stansbury was contacted by Gary Gouvas, an ex-son-in-law of Donald Hayes. Gouvas informed Stansbury that he believed Hayes had shown Stansbury an altered version of the Sluss Cruise that Gouvas had created. (Dep. Richard Stansbury [DN 134-1] at 90:20; Dep. Gouvas [DN 112] at 44:13.) This "Gouvas Cruise" appears very similar to the

Sluss Cruise document entitled "Tract: volume, total by product and species," except it states that there are only about 5 million board feet on the Kimball and Yager tracts, instead of the 7 million originally included in the Sluss Cruise. (Gouvas Cruise [DN 134-2] at 38.) Gouvas stated that he was asked by Hayes to change the numbers in a spread sheet in March 2010 while Jeanette Hayes, Donald's wife, and Jimmy Speaks were present, and that Donald Hayes told him that the new spreadsheet was just to be used for Donald's personal use. (Dep. Gouvas [DN 112] at 31:23, 34:8, 48:11.) Sluss indicated that he did not prepare the inventory sheet that states there are only 5 million board feet. (Dep. Rick Sluss [DN 127-1] at 117:2.)

The Stansburys filed this action originally against Hopkins Hardwoods, alleging fraud (Count I), breach of contract (Count II), misappropriation, theft, and trover/conversion (Count III), tortious interference with a potential contract (Count IV), unjust enrichment (Count V), trespass (Count VI), harvesting trees in violation of KRS 364.130 (Count VII), and violation of state constitutional rights entitling them to injunctive relief (Count VIII), and seeking further injunctive relief (Count IX) and punitive damages (Count X). (Compl. [DN 1] ¶¶ 30–76.) They later amended their complaint to add Christ, Hayes, and Speaks as Defendants and now allege that all Defendants violated the Racketeer Influence and Corrupt Organization Act (RICO) (Count XI), that all Defendants conspired to violate RICO (Count XII), and that all defendants either committed common law fraud or aided and abetted each other in doing so (Count XIII). (Am. Compl. [DN 27] ¶¶ 88–113.) The Court denied the Plaintiffs' request for a preliminary injunction directing Hopkins Hardwoods to abide by the terms of the timber deed. (DN 12.) However, after the Stansburys hired a security guard to keep Hopkins Hardwoods and its subcontractors off of the Kimball and Yager tracts, the Court granted Hopkins Hardwoods motion for a preliminary injunction prohibiting the Stansburys from interfering with Hopkins

Hardwoods timber operations on the tracts.  (DN 67.)  Hopkins Hardwoods also filed a counterclaim against the Stansburys, alleging conversion (Counterclaim Count I), breach of contract (Counterclaim Count II,) interference with business relationships (Counterclaim Count III), and unjust enrichment (Counterclaim Count IV), and seeking punitive damages (Counterclaim Count V).  (DN 69.)  All Defendants have now moved for summary judgment as to all of the Stansburys' claims as they pertain to each Defendant.  (DN 132, 138-1.)  Hopkins Hardwoods and Christ have also moved to exclude the testimony of the Plaintiffs' expert witness, Vance Mosely.  (DN 135-1.)  Further facts will be discussed as they are pertinent to each party's argument.

## II.   STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to

particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

### III.    MOTION FOR SUMMARY JUDGMENT

### A. COUNTS I AND XIII – FRAUD

The Stansburys argue that each Defendant is liable for fraudulently inducing the sale of the timber rights to the Kimball and Yager tracts for substantially less than their true market value.  They argue that the Defendants aided and abetted each other in creating the Gouvas Cruise, which understated the amount of board feet located on the Stansburys' property, and that the Gouvas Cruise induced them to sell the property for $2.5 million, $1 million less than Richard Stansbury's original valuation.  Richard Stansbury stated that he originally valued the timber rights at $3.5 million, but that he ultimately accepted $2.2 million from Hopkins Hardwoods after receiving the Gouvas Cruise from Hayes that indicated less board feet than the Gordon Cruise had previously indicated.  (Dep. Richard Stansbury [DN 134-1] at 77:8, 79:23.) He further stated that he arrived at the $2.2 million figure because the Gouvas Cruise showed about two-thirds the amount of board feet as the Gordon cruise, and $2.2 million roughly equated to two-thirds of $3.5 million.  (*Id.* at 98:2.)

Under Kentucky law, a claim for fraud requires proof of six elements:   "(1) that the declarant made a material representation to the plaintiff, (2) that this representation was false, (3) that the declarant knew the representation was false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the misrepresentation, (5) that the plaintiff relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff." *Flegles, Inc.*

*v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009) (citing U*nited Parcel Service Company v. Rickert*, 996 S.W.2d 464 (Ky. 1999)). "The plaintiffs reliance, of course, must be reasonable, or, as the Restatement [(Second) of Torts] states, 'justifiable.'" *Id.* (citations omitted). The *Flegles* Court summarized a plaintiff's "duty to protect themselves" by stating that "the law imposes upon recipients of business representations a duty to exercise common sense." *Id.*

The Defendants argue that Plaintiff's fraud claims must fail because, among other reasons, any reliance Richard Stansbury placed on the Gouvas cruise was unreasonable. The Court agrees. Stansbury indicated that he "trusted the valuation and the appraisal" Gordon performed in 2008. (*Id.* at 100:11.) Yet, instead of approaching the Gouvas Cruise and its lower estimates with suspicion, Stansbury based the sale price of the timber rights solely on the Gouvas Cruise and ignored the Gordon Cruise. Stansbury could have done a number of "common sense" tasks to protect himself. He could have contacted Gordon to see if he could explain the discrepancies between the two cruises. He could have requested the full cruise from Hayes, rather than just a one-page summary, to see if the cruises relied on different methods for arriving at their totals. He could have had another cruise completed. But he did none of these, making his reliance on the Gouvas Cruise unjustifiable. (*Id.* at 99:9.) *See Buridi v. Branch Banking and Trust Co.*, 654 F. App'x 802 (6th Cir. 2016) (plaintiff unreasonably relied on representations made by defendant, as plaintiff failed to perform due diligence by investigating the basis for the figures provided to them, defeating claim for fraud under Kentucky tort law).

The Plaintiffs point to a line of Kentucky cases that stand for the proposition that a "defrauding party cannot escape [liability] on the ground that the complaining party should not have trusted him, or was negligent in so doing." *Meyers v. Monroe*, 226 S.W.2d 782, 785 (Ky. 1950) (citing *Great A. & P. Co. v. City of Lexington*, 76 S.W.2d 894 (Ky. 1935)). However,

even if this line of cases has never been explicitly overruled, the proposition for which these cases stand is contradicted by the Kentucky Supreme Court's more recent opinion in *Flegles*, as that case clearly imposes a requirement that reliance be reasonable.

No reasonable jury would conclude that Stansburys' reliance on the allegedly fraudulent representations made in the Gouvas Cruise was reasonable; thus, the Stansburys have no viable claim for fraud. As such, there is no underlying claim in which any Defendant could have aided or abetted. Therefore, the Defendants' motions for summary judgment as to Counts I and XIII for fraud are **GRANTED**.

## B. COUNTS XI AND XII - RICO

The Stansburys allege that the Defendants violated the Racketeer Influence and Corrupt Organizations Act (RICO) through the creation of the Gouvas Cruise and its use in inducing the Richard Stansbury to lower the sale price of the timber rights to the Kimball and Yager tracts. They also allege that the Defendants formed an unlawful conspiracy to commit acts in violation of RICO. The Defendants argue that these claims must fail since the Plaintiffs have failed to establish a "pattern of racketeering activity" as required under RICO, among other arguments.

RICO provides, in pertinent part, that it "shall be unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . ." 18 U.S.C. § 1962(c). "'Racketeering activity' encompasses many criminal acts, including those indictable for mail or wire fraud." *Grubbs v. Sheakley Group Inc.*, 807 F.3d 785, 804 (6th Cir. 2015) (citing 18 U.S.C. § 1961(1)). A "pattern" of racketeering activity requires at least two acts of racketeering within a ten year period, 18 U.S.C. § 1961(5), but even then, "two acts of racketeering activity within ten years will not generally give rise to

liability. Predicate acts of racketeering must be both continuous and related to combine to produce a pattern." *Grubbs*, 807 F.3d at 804 (citations and quotations omitted).

Taking the evidence in a light most favorable to the Stansburys, their claims under RICO must fail, as there is insufficient evidence to support more than one predicate act of racketeering. According to Richard Stansbury, Don Hayes sent him via mail the Gouvas Cruise in the fall of 2011. (Dep. Richard Stansbury [DN 134-1] at 77:8.) Assuming that this would constitute indictable mail fraud, this amounts to one act of racketeering. But the Stansburys have offered no evidence of any other act of racketeering that would even require the Court to evaluate the continuity and relatedness of the individual acts. The Amended Complaint is in no way specific as to what the Defendants actually did other than "preparing and then transmitting information by wire and/or mail to the Plaintiffs," (Am. Compl. [DN 27] ¶ 94), and the Plaintiffs' response to the present motions points to "follow-up" communication that the Defendants made after the Gouvas Cruise was allegedly sent. (Pl.'s Resp. to Def. Mot. for Summ. J. [DN 143] at 12.) But Stansbury offers no specifics in his deposition about the time, place, and nature of these discussions, instead repeatedly just referring to them as "negotiations" and offering contradictory statements about who those negotiations were with. (*Id.* at 97:14 ("the only person that negotiated that price was Henry Christ"), 98:15 ("I'm sure Henry, Don Hayes, and Jimmy [negotiated the price]").) And his testimony even casts doubt on whether the price was actually ever negotiated, as Stansbury gives no specifics about the content of those negotiations but speaks with certainty about how he calculated the sales price down from $3.5 million to $2.2 million on his own after receiving the Gouvas Cruise. (*Id.* at 98:4, 174:17.) Thus, the Stansburys have failed to provide sufficient evidence that two or more racketeering activities took place that gave rise to a pattern of racketeering activity.

Further, the Stansburys have also failed to offer sufficient evidence of a RICO conspiracy, as prohibited under 18 U.S.C. § 1962(d). To prove a conspiracy under RICO, the plaintiff must show that "(1) the defendant agreed . . . to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *United Food and Commercial Workers Union and Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 856 (7th Cir. 2013) (citations and quotations omitted). Again, there is no evidence of a second act of racketeering activity that was even contemplated by the Defendants, much less agreed to and completed. Therefore, the Defendants' motions for summary judgment as to Counts XI and XII for violations of RICO are **GRANTED**.

## C. COUNT II – BREACH OF CONTRACT

The Stansburys assert that Hopkins Hardwoods breached the terms of the timber deed by (1) failing to keep gates to the property locked at all times, (2) harvesting cedar trees, (3) harvesting undersized trees from both the Yager (under fourteen inches at twelve inches above the ground) and Kimball (under fourteen inches at stump height) tracts, and (4) taking rock from the creek beds for use in constructing roads on the properties.[1] (Compl. [DN 1] ¶¶ 38–45.) Hopkins Hardwoods has moved for summary judgment on each issue.

### 1. FAILURE TO LOCK GATES

The timber deed states that Hopkins Hardwoods "shall keep all gates locked when it is not on the subject lands." (DN 134-2, at 47.) Richard Stansbury stated in a declaration early in this case that he has "personally observed that the gates to the Lapland[2] property have been left

---

[1] The Stansburys have conceded their claim that the contract was breached when Hopkins Hardwoods failed to adhere to the Kentucky State Best Management Practices.

[2] The Kimball tract is also known locally as Lapland, and the two have been used interchangeably throughout this litigation.

unlocked, by the HHI crews conducting timber harvesting operations on the property, after working hours." (Decl. Richard Stansbury [DN 10-1] ¶ 7.)  However, counsel for the Stansburys conceded that this was merely proof that the gates were left unlocked, not that Hopkins Hardwoods left them unlocked.[3]  In response, Hopkins Hardwoods notes that it is not in exclusive possession of the property, as the Stansburys allow individuals to hunt on the property. (Dep. Richard Stansbury [DN 134-1] at 46:14.)  Further, Hopkins Hardwoods and its subcontractors have had numerous locks cut off of the gates, possibly by trespassers.  (Dep. John Williams [DN 123-1] at 50:14; Dep. Joseph Speaks [DN 124-1] at 38:10.)

A claim for breach of contract requires proof of three elements: "(1) a contract between the parties; (2) a breach of that contract; and (3) damages caused by the breach."  *Texas Capital Bank, N.A. v. First Am. Title Ins. Co.*, 822 F. Supp. 2d 678, 682 (W.D. Ky. 2011) (citations omitted).  Taking the evidence in a light most favorable to the Plaintiffs, there is a genuine dispute as to whether Hopkins Hardwoods failed to keep all gates locked when it was not on the property.  There is evidence that the gates were left unlocked, as well as evidence that any failure to keep the gates locked was not caused by Hopkins Hardwoods.  While the Stansburys' evidence is circumstantial, it is not so thin that no reasonable juror could conclude that Hopkins Hardwoods breached the contract. With both sides having met their evidentiary burden, summary judgment is inappropriate, and Hopkins Hardwoods' motion for summary judgment as to failing to lock the gates is **DENIED.**

---

[3] At the hearing on the Stansburys' motion for a preliminary injunction, the Court asked in relation to the declaration whether their only proof as to the gates being unlocked was just "proof that you found the locks opened? I guess the gates opened?"  Counsel for the Stansburys replied, "That would be correct."  (Prelim. Inj. Hr'g Tr., June 10, 2016 [DN 62] at 16:7.)

## 2. HARVESTING CEDAR TREES

The timber deed states that "[n]o cedar is to be harvested" on either tract." (DN 134-2, at 47.) Richard Stansbury testified that he does not know the number of cedar trees that have been cut, but he has provided photographic evidence of what he claims to be cedar trees that have been felled on his property. (Dep. Richard Stansbury [DN 134-1] at 140:22; Photos [DN 134-2] at 78–79.) Robert Christ testified that at least five cedar trees have been removed for various reasons related to the overall timber operation. (Dep. Robert Christ [DN 130-1] at 238:16.) Hopkins Hardwoods argues that any cedar trees that were cut down did not violate the contract, as they were removed for legitimate purposes such as to clear space for a roadway or to gain access to hillside timber, and that the cedar trees were never actually harvested because they remained on the property. (*Id.* at 238:16; Dep. Joseph Speaks [DN 124-1] at 24:24.)

Taking the evidence in a light most favorable to the Stansburys, there is a genuine dispute as to whether Hopkins Hardwoods harvested any cedar trees. The Stansburys have met their evidentiary burden by presenting credible evidence that cedar trees were cut down on the property. Hopkins Hardwoods makes mostly legal arguments in opposition, asserting that no cedars were actually "harvested" since they were not carried off the property and that it had the right to cut down the cedars that it did. However, Hopkins Hardwoods offers no guidance to the Court as to how it should interpret the contract, or what legal doctrines should be relied upon, so as to reach this interpretation. Instead, it merely asserts that this interpretation is the correct one. Without a sufficient explanation as to why the Court should interpret the term "harvest" to require the carrying away of the tree or find some implied right to remove cedar trees for certain purposes, the Court will decline to do so at this time. Therefore, the motion for summary judgment as to the claim for harvesting cedar trees is **DENIED**.

### 3. HARVESTING UNDERSIZED TREES

The timber deed states that Hopkins Hardwoods may remove timber from the Yager tract that is "not less than 14 inches in diameter at a point not less than one foot from the ground." (DN 134-2, at 46.)  It further states that Hopkins Hardwoods may remove timber from the Kimball tract that is "not less than 14 inches in diameter at the stump." (*Id.* at 47.)  Again, while Stansbury is not certain of the total number of trees that were removed, he has provided photographic evidence tending to show that trees were cut down that were smaller than these prescribed standards.  (Dep. Richard Stansbury [DN 134-1] at 143:7; Photos [DN 134-2] at 71–76.)  However, Vance Mosely, an expert retained by the Stansburys to perform an evaluation of the premises, stated, "That stuff before 14 inches, there wasn't much of it.  I'm saying there's very little impact from that."  (Dep. Vance Mosely [DN 133-1] at 66:25.)  Hopkins Hardwoods argues that their removal of undersized trees was permissible, and that the Stansburys have presented no evidence as to their damages from the removal of undersized trees.

Taking the evidence in a light most favorable to the Stansburys, there is a genuine dispute as to whether Hopkins Hardwoods cut down any undersized trees on either tract.  Again, the Stansburys have met their evidentiary burden by presenting credible evidence that undersized trees were cut down on the property.  Hopkins Hardwoods argues that the contract permitted its removal of certain undersized trees, but again, it does not offer the Court any guidance as to how it should interpret the contract so as reach that conclusion.  Thus, the Court will again decline to interpret the contract in such a manner at this time.  And as to the issue of damages, Hopkins Hardwoods misstates the testimony of Mosely by asserting that he "found Plaintiffs incurred no damages as to any undercuts on the Property."  (Mot. for Summ. J. [DN 138-1] at 23.)  While Mosely testified that there "wasn't much" removal of undersized trees, he did not categorially

deny the existence of any and all damages from their removal. While the ultimate damages may be minimal, the Stansburys have met their burden at this stage.

However, the Court does find that the Stansburys have failed to present evidence of damages for any undersized trees cut from the Yager tract. The timber deed prohibits Hopkins Hardwoods from cutting any undersized tree from the Yager tract, and if it did in fact cut any from that tract, it would be a breach. But the Stansburys did not have any right to cut undersized trees from the Yager tract, either, as the deed for the sale of the Yager tract from Stansbury to Yager Family, LLC only reserves to the Stansburys the timber rights for all trees that are fourteen inches wide at twelve inches off the ground. (Yager Deed [DN 134-2] at 33.) Therefore, the Stansburys do not have any damages from undersized trees being cut down from the Yager tract, as they have no interest in those trees. The Stansburys have presented no other evidence of damages, so their claim for breach of contract as to any undersized trees on the Yager tract fails.

Therefore, the motion for summary judgment as to the claim for cutting undersized trees from the Kimball tract is **DENIED**. The motion for summary judgment as to the claim for cutting undersized trees from the Yager tract is **GRANTED**.

### 4. REMOVAL OF ROCK FROM CREEK BEDS

Finally, the Stansburys argue that Hopkins Hardwoods breached the terms of the timber deed by removing rock from the creek bed and using it to build and maintain roads on the property. The timber deed is silent as to any permissible use of the rock in the creek bed, and the Stansburys do not explain what contractual provisions would govern the removal of the rock. The Stansburys have property rights in the rock and any cause of action for a violation of those rights would lie in tort, not contract. Therefore, the motion for summary judgment as to breach of contract claim for the removal of rock is **GRANTED**.

## D. COUNT III - MISAPPROPRIATION, THEFT, OR TROVER/CONVERSION

Count III of the Complaint alleges that Hopkins Hardwoods unlawfully obtained undersized trees, cedar trees, and creek bed rock from the Stansburys' property. (Pl.'s Compl. [DN 1] ¶¶ 46–49.) While the Stansburys assert numerous torts, the parties' briefs focus solely on conversion. The elements of a claim for conversion are:

(1) the plaintiff had legal title to the converted property;

(2) the plaintiff had possession of the property or the right to possess it at the time of the conversion;

(3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment;

(4) the defendant intended to interfere with the plaintiff's possession;

(5) the plaintiff made some demand for the property's return which the defendant refused;

(6) the defendant's act was the legal cause of the plaintiff's loss of the property; and

(7) the plaintiff suffered damage by the loss of the property.

*Jasper v. Blair*, 492 S.W.3d 579, 582 (Ky. Ct. App. 2016) (citations omitted).

The Stansburys argue that Hopkins Hardwoods committed the tort of conversion when it cut down undersized and cedar trees from the property. However, "[a]t common law, cutting someone else's timber would be treated as a trespass," not conversion. *Meece v. Feldman Lumber Co.*, 290 S.W.3d 631, 632 (Ky. 2009) (citing *Hurst v. Com.*, 125 S.W.2d 772 (Ky. 1939)). Therefore, the motion for summary judgment as to the claim of conversion of the undersized and cedar trees is **GRANTED**.

The Stansburys also allege that the rock from the creek bed was converted when it was taken and allegedly used to make roads throughout the properties. First, the Stansburys have no rights in the creek bed rock on the Yager tract, so they likewise have no cognizable claim for

conversion of that rock. Turning to the creek bed rock on the Kimball tract, the Stansburys claim must fail for a lack of damages. Hopkins Hardwoods argues that the rock was only used to improve the existing roads on the property or create new ones, and the Stansburys' expert witness testified that he "didn't see anything damaged" when he was evaluating the property. (Dep. Vance Mosely [DN 133-1] at 72:11.) The Stansburys do not respond to this argument that no damages were incurred from the movement of the rock from the creek bed to the roads, other than making the conclusory statement that Hopkins Hardwoods has "not established an entitlement to Summary Judgment upon Count 3" but pointing to no evidence in the record to suggest otherwise. (Pl.'s Resp. to Def.'s Mot. for Summ. J. [DN 143] at 17.) Based on this lack of response, the only evidence as to damages this Court will consider is the testimony of Vance Mosely, who indicated that the use of the rock caused no damage to the property or the Stansburys' interests. Therefore, the motion for summary judgment as to the claim for conversion of the creek bed rock is **GRANTED**.

### E. COUNT IV - TORTIOUS INTERFERENCE WITH A POTENTIAL CONTRACT

In its response to Hopkins Hardwoods' motion for summary judgment, the Stansburys have conceded their claim for tortious interference with a potential contract. Therefore, the motion for summary judgment as to that count is **GRANTED**.

### F. COUNT V – UNJUST ENRICHMENT

The Stansburys argue that "as a result of Defendant's misappropriation, theft, trover and/or conversion of the harvested trees under 14 inches in diameter and the cedar trees harvested from Lapland, as well as the rock taken from creek beds on Lapland . . . Defendant has been unjustly enriched at the expense of Plaintiffs." (Compl. [DN 1] ¶ 55.) "In order for a party to prevail under a theory of unjust enrichment, it must prove three elements: (1) benefit conferred

upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Furlong Dev. Co. LLC v. Georgetown-Scott Cty. Planning and Zoning Comm'n*, 504 S.W.3d 34, 39–40 (Ky. 2016) (citations and quotations omitted). However, "unjust enrichment is unavailable when the terms of an express contract control." *Id.* at 40. In this case, the terms of the timber deed explicitly prohibit the harvesting of undersized and cedar trees. Those terms control, and there is no claim for unjust enrichment for any unauthorized harvesting of trees. And as to the creek bed rock, it cannot be said that a benefit was conferred on Hopkins Hardwoods when it used the creek rock to make and improve roads on the property. The evidence submitted by both parties indicates that the use of the rock to improve the roads increased the value of the property for the Stansburys, and no benefit was conferred upon Hopkins Hardwoods for which equity would require payment. Therefore, the motion for summary judgment as to the claim for unjust enrichment is **GRANTED**.

### G. COUNT VI– TRESPASS

Count VI of the Complaint asserts that Hopkins Hardwoods trespassed when it cut down undersized and cedar trees and took rock from the creek beds. The parties have provided no guidance to the Court as to whether these claims are to be considered a trespass upon the land or upon a chattel. However, because Hopkins Hardwoods had a right to be present on the Yager and Kimball tracts through the timber deed, the Court will consider the claim to be one upon the chattels of the Stansburys. Hopkins Hardwoods could still trespass upon the undersized and cedar trees and the creek rock, so long as there has been sufficient "intermeddling with the chattel in the possession of another." *Madison Capital Co, LLC v. S & S Salvage, LLC*, 794 F. Supp. 2d 735, 740 (W.D. Ky. 2011) (quoting *Caldwell's Kentucky Form Book*, § 126.00 (2010)).

The Court will first look to the claim for trespass as to the trees. Again, it must be noted that the deed conveying the Yager tract to Yager Family, LLC, only gave the Stansburys the timber rights to the property for five years as to "timber which must not be less than 14 inches in diameter at a point not less than one foot from the ground." (Yager Deed [DN 134-2] at 33.) Therefore, the Stansburys possessed no right to the undersized trees on the Yager tract, and they have no cause of action in trespass for any undersized trees that were cut from the Yager tract. But as to the undersized trees on the Kimball tract, the Stansburys have submitted sufficient evidence to avoid summary judgment by demonstrating that undersized trees were cut down on the tract. The same is true to the cedar trees on both the Yager and Kimball tracts. The Stansburys have demonstrated that at least some cedar trees were cut down. Cutting the timber of another is sufficient "intermeddling" with their property to sustain a claim for trespass. *Meece*, 290 S.W.3d at 632. Just as with the claims for breach of contract, Hopkins Hardwoods argues that it was permissible to cut the trees that it did in order to gain access to other parts of the property. But because it does not offer the Court any guidance as to how it should interpret the contract so as reach that conclusion, the Court will again decline to interpret the contract in such a manner at this time. Therefore, the motion for summary judgment as to the cedar trees and the undersized trees on the Kimball tract is **DENIED**.[4] The motion for summary judgment as to the undersized trees on the Yager tract is **GRANTED**.

Turning to the creek rock, the Court previously determined that the claim for the conversion of the creek bed rock was not viable, as the Stansburys failed to rebut the evidence

---

[4] The parties' briefs did not discuss whether the Stansburys' claims for trespass would sustain a challenge under the independent legal duty doctrine. *See Mims v. Western-Southern Agency, Inc.*, 226 S.W.3d 833, 836 (Ky. Ct. App. 2007) ("The failure to perform a contractual obligation typically does not give rise to a cause of action in tort . . . However, if a plaintiff can establish the existence of an independent legal duty, he may maintain an action in tort even though the acts complained of also constitute a breach of contract"); *Lewis v. Ceralvo Holdings, LLC*, 2012 WL 32607, at *5–6 (W.D. Ky. Jan 6. 2012). Whether this doctrine applies to the Stansburys' trespass claims remains an issue that the Court may need to address before these claims reach final resolution at trial.

that they incurred no damages from the use of the rock to make or improve roads on the property.  Unlike a claim for trespass to land, trespass to chattels requires proof of damages.  *See* Restatement (Second) of Torts § 218 cmt. e ("The interest of a possessor of a chattel in its inviolability, unlike the similar interest of a possessor of land, is not given legal protection by an action for nominal damages for harmless intermeddlings with the chattel").  As with the claim for conversion, the Stansburys have offered no evidence as to the damages they incurred when the rock was moved from the creek.  Therefore, the motion for summary judgment as to the trespass claim of the creek bed rock is **GRANTED**.

## H. COUNT VII –TRESPASS TREBLE DAMAGES

The Stansburys argue that they are entitled to recover treble damages for all trees that were cut down without permission under KRS 364.130.   That statute states that

> any person who cuts or saws down, or causes to be cut or sawed down with intent to convert to his own use timber growing upon the land of another without legal right or without color of title in himself to the timber or to the land upon which the timber was growing shall pay to the rightful owner of the timber three (3) times the stumpage value of the timber and shall pay to the rightful owner of the property three (3) times the cost of any damages to the property as well as any legal costs incurred by the owner of the timber.

KRS 364.130(a).  Hopkins Hardwoods argues that it did not have the requisite intent to convert the undersized and cedar trees for its own use.   In *Penix v. Delong*, 473 S.W.3d 609, 614 (Ky. 2015), the Kentucky Supreme Court interpreted the statute so as to require "a specific intent here to do wrong."  The court clarified this requirement by stating, "We hold that the trespasser must have intended to cut timber which he knows he is unauthorized to cut."  *Id.* at 615.  The court made clear that it was not "interpret[ing] the statute to read that only the unauthorized cutting of

the timber itself must be intentional," since "[t]o do so would make it a strict liability statute" due to conversion already requiring an intent to exercise dominion and control. *Id.* at 614.

Thus, the Court must apply the statute and this heightened requirement of intent to the present case. Hopkins Hardwoods had no legal right to remove the undersized or cedar trees, but it argues that the removal of these trees was permissible under the timber deed out of necessity to gain access to other trees and move vehicles through the property. However, it points to no deed provisions or legal doctrines for this Court to determine if such an exception to the clear language of the deed regarding undersized and cedar trees is applicable. Thus, Hopkins Hardwoods have offered no evidence that it was acting under color of title either. *See Meece*, 390 S.W.3d at 631 ("Color of title is not based on a subjective belief, but on objective evidence of title from which a subjective belief may be founded"). Further, the Stansburys have presented evidence that undersized and cedar trees were cut.

The only issue that remains is whether Hopkins Hardwoods intended to convert the timber for its own use. In *Penix*, the court found that there was no evidence of an intent to convert, based on the facts that the harvesters were from Ohio and not familiar with the property line, a survey was done prior to starting that demonstrated a respect for property lines, and testimony that the encroachment had been an honest mistake. *Id.* at 615. In comparison, the Kentucky Court of Appeals found in *Bryson v. The Alma D. Roberts Revocable Living Trust*, 2017 WL 129072, at *2 (Ky. Ct. App. Jan. 13, 2017), that treble damages were appropriate, as the fact that timber was cut after the defendant had been notified of a property line dispute demonstrated that the defendant intended to cut timber he knew he was not authorized to cut.

The present case, though, is not one of a failure to respect a property line. Hopkins Hardwoods asserts that any undersized or cedar trees that were cut were done so because of their

location: they needed to be removed to either reach other harvestable trees or to allow vehicles through to the harvesting sites. This would seem to indicate that, if the trees were cut without authorization, it was not done with the intent to convert them for Hopkins Hardwoods own use, but rather merely out of convenience. However, Richard Stansbury testified that he regularly saw undersized trees in log yards that were to be taken off the premises and likely sold to Dunaway timber. (Dep. Richard Stansbury [DN 134-1] at 143:19.) Based on this evidence, there is a genuine factual dispute as to whether Hopkins Hardwoods acted with the intent to cut timber that it knew it was not authorized to cut and did so to convert it for its own use. Therefore, summary judgment is not appropriate, and the motion for summary judgment as to treble damages is **DENIED**.

### I. COUNT VIII – CONSTITUTIONAL VIOLATIONS

Finally, Hopkins Hardwoods moves for summary judgment on Count VIII for injunctive relief related to violations of the Kentucky Constitution. The Stansburys argue that Hopkins Hardwoods has not properly moved for summary judgment as to Count VIII as it failed to raise the issue in its original motion. Hopkins Hardwoods first moved for summary judgment on this count in its reply, giving the Stansburys no chance to respond. Therefore, the Court will not consider the argument. *Harrington v. DH Capital Mgmt., Inc.*, 2014 WL 5776203, at *5 (W.D. Ky. Nov. 5, 2014).

### J. SUMMARY

To summarize, the Court grants summary judgment on Counts I and XIII for fraud in favor of all Defendants. The Court also grants summary judgment on Counts XI and XII for RICO violations in favor of all Defendants. Since this disposes of all claims that were asserted against Christ, Hayes, and Speaks, they are dismissed from the action.

The Court grants summary judgment on Count II for breach of contract as it relates to removing the creek bed rock and cutting down undersized trees located on the Yager tract in favor of Hopkins Hardwoods; it denies summary judgment on Count II as it relates to failing to keep the gates locked, cutting down cedar trees located on both tracts, and cutting down undersized trees located on the Kimball tract.

The Court grants summary judgment on Count III for conversion, Count IV for tortious interference with a potential contract, and Count V for unjust enrichment in favor of Hopkins Hardwoods.

The Court grants summary judgment on Count VI for trespass as it relates to cutting down undersized trees on the Yager tract and removing the creek bed rock in favor of Hopkins Hardwoods; it denies summary judgment on Count VI as it related to cutting down the cedar trees on both tracts and the undersized trees on the Kimball tract.

The Court denies summary judgment on Count VII for treble damages.

### IV. MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESS

Hopkins Hardwoods and Christ have also moved to exclude testimony of the Stansburys' expert witness, Vance Mosely, on the grounds that his testimony is unreliable. (DN 135-1.) The grounds for this motion rest entirely on the method in which Mosely calculated the Stansburys' damages as it related to how the Gouvas Cruise affected the sales price of the timber rights to Hopkins Hardwoods. All counts related to that transaction (Counts I, XI–XIII) have been dismissed. Therefore, the motion to exclude the testimony is **DENIED AS MOOT**.

### V. SUBSTITUTION OF PARTIES

As one final matter, the Court must address an issue regarding the proper named Defendant in this case. In their Amended Complaint, the Stansburys asserted claims against a

"Joseph P ('Jimmy') Speaks."  (DN 27.)  James C. Speaks, who is known as Jimmy, answered, stating that "Joseph P. Speaks is not a proper party to this action.  Joseph P. Speaks is the brother of James C. ('Jimmy') Speaks.  James C. ('Jimmy') Speaks is the proper party to this action." (Answer [DN 32] ¶ 25.)  James C. Speaks further asked the Court to "substitute James C. Speaks as the proper party in place of his brother, Joseph P. Speaks."  (*Id.*)  It is clear from the record that James C. Speaks was the individual whom the Stansburys intended to bring into this action as a Defendant, and they have failed to prosecute any claims against Joseph P. Speaks. Therefore, pursuant to Fed. R. Civ. P. 21, Joseph P. Speaks is **DISMISSED** from the action as a Defendant.

## VI. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the motion for summary judgment by Defendants Donald Hayes and James C. Speaks (DN 132) is **GRANTED**. The motion for summary judgment by Defendants Hopkins Hardwoods, Inc. and Robert Henry Christ (DN 138-1) is **GRANTED IN PART** and **DENIED IN PART**.  Defendants Robert Henry Christ, Donald Hayes, James C. Speaks, and Joseph P. Speaks are hereby **DISMISSED** from the action.  The motion by Hopkins Hardwoods and Christ to exclude the expert witness of Plaintiffs Richard L. and Mary Stansbury (DN 135-1) is **DENIED AS MOOT**.

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

April 11, 2017

cc:     Counsel of Record